465 So.2d 432 (1983)
Cornelius SINGLETON, alias
v.
STATE.
1 Div. 361.
Court of Criminal Appeals of Alabama.
February 1, 1983.
Rehearing Denied March 1, 1983.
Certiorari Denied May 27, 1983.
On Return to Remand April 24, 1984.
Rehearing Denied June 12, 1984.
*433 Michael Scheuermann and Reggie Stephens, Mobile, for appellant.
Charles A. Graddick, Atty. Gen., and Jennifer M. Mullins and Edward E. Carnes, and John Gibbs, Asst. Attys. Gen., for appellee.
Alabama Supreme Court 82-553.
BARRON, Judge.
Cornelius Singleton was indicted for, and convicted of, the murder of Sister Ann Hogan by strangling her with a knotted towel while he was robbing her, in violation of § 13-11-2(a)(2), Code of Alabama 1975. After a separate sentencing hearing, which complied with the Alabama Supreme Court's guidelines in Beck v. State, 396 So.2d 645 (Ala.1980), the jury fixed punishment at death. The trial court held a subsequent sentencing hearing as mandated by §§ 13-11-3 and -4, Code of Alabama 1975. After weighing the aggravating and mitigating circumstances, the trial court set appellant's sentence at death by electrocution.
On November 12, 1977, Sister Ann Hogan was killed in the Catholic cemetery on Stone Street in Mobile, Alabama, where, because it was All Souls Month, she had gone to pray for the dead. Her body was found by police officers early in the evening after an extensive search, initiated by Sister Julie Hanser and Sister Mary Elizabeth when Sister Ann did not report back to work as expected. Sister Ann's body had been buried face down under a pile of stones and other debris in a wooded area at the back of the cemetery. Her hands and feet had been bound with her own shoe laces and some knotted strips of towel. Her hands had been tied behind her back. She had been strangled with a knotted strip of towel that had been wrapped and twisted around her neck and partially stuffed in her mouth. Her clothes had been ripped and torn, as if she had been dragged across the cemetery, but there was no evidence of any sort of sexual attack. Several of Sister Ann's personal belongings had been found in different areas of the cemetery before her body was discovered, and several other items were found near the body. However, several items, including Sister Ann's silver Waltham watch, had, apparently, been taken by her assailant.
Dr. Brian Montgomery testified that the cause of death was asphyxiation, due to the knotted towel that had been twisted around Sister Ann's neck, and that death occurred between three and five o'clock in the afternoon of November 12, 1977. He stated that, in addition to the hemorrhages of neck tissue and the lining of the larynx, there was also an abrasion on Sister Ann's head and numerous scratches and cuts on her body, primarily on her right leg.
Wanda Jackson, who was washing clothes at her mother's residence across the street from the cemetery, testified that late that afternoon she heard, for about an *434 hour, what she thought was several children "hollering" in the cemetery. She explained that she was not alarmed by what she heard because it was not unusual for the children in that neighborhood to play in the cemetery.
The appellant was arrested for Sister Ann's murder by Officer Ramsey and Sergeant Bell of the Mobile Police Department on November 19, 1977, one week after the incident. Sergeant Bell and Officer Connick (also of the Mobile Police Department), who were both present during appellant's interrogation, testified that the appellant was advised of his Miranda rights prior to any questioning and that no threats, promises of reward or leniency, or any other inducements were made to the appellant.
The appellant indicated that he understood his Miranda rights and signed a printed "waiver of rights" form. He then admitted killing Sister Ann in the Catholic cemetery on Stone Street. During two separate trips to the cemetery with police officers, the appellant demonstrated how he had approached Sister Ann where she was praying (at the burial site of deceased nuns), and he showed the officers the exact locations of Sister Ann's keys and her pager, where he had discarded them in separate places on the day of the killing. Appellant's detailed statement, as transcribed on November 19, was read into evidence by Sergeant Bell as follows:
"`The following statement is given freely and voluntarily without any threats or promises being made to me and to get me to give this statement. I am fully aware of my rights and remain silent [sic] and to have an attorney present with me while I am giving this statement. I freely and voluntarily waive these rights and I am aware that this statement can be and will be used against me in a court of law.
"`My name is Cornelius Singleton. They call me Neil. I am 21 years old and I stay at 620 Neese Avenue in Prichard. I met Cathy Barnes the same day I got out. I drink beer and smoke every now and then, but no drugs.
"`On November the 11th, between 11:30 P.M. and 12:00 I picked up Cathy at the Diamond Club on Craft Highway. We walked around to Carrie May's house. We stayed there all night until about 10:00 Saturday morning. We walked around to my brother's house on Osage Street, but he wasn't home. We sat on his porch about 30 minutes. Then we walked up to the Foodtown on Stone Street and we left there and we was going to the cemetery on Stone Street to talk. We never did get there. On our way we saw Cathy's brother at the Commonwealth Bank on Stone Street. He blowed the horn. He rode us around and talked to me. He dropped me off on Craft Highway at Velma Street. Cathy's brother give me his phone number and I was supposed to call him at 1:30 Saturday afternoon. When I called, me and Cathy was supposed to get together. Me and Cathy had brokeup. Cathy had quit me and I wanted to get back with her to make up. After I left CathyCathy, I met her brother. I walked to the Catholic Cemetery. They dropped me off about 11:30. I got to the cemetery about 12:00 and I stayed there all that time. I was just sitting down. I saw the nun about 1:30 when she came in the cemetery walking.
"...
"`She walked on down to where the statue is and where some other nuns are buried at. I walked on down to where she was. She had some beads on her hand, talking to herself. I came up to where she was and I told her my problem. The problem was about my old lady, Cathy, and about us breaking up. She said that she would pray for me and Cathy. I just wanted her to hurry up and get in touch with Cathy. She said she didn't have no transportation. I said, You know, can we get some. She said somebody brought her down there. All of a sudden, I got worried about Cathy. She started to walk off. I grabbed her around the waist and she fainted then. I picked her up and took her and walked into the wooded area with her. I laid her *435 down on the ground and tied her up. I tied her with her shoestrings around her feet. I tied her hands with her shoestrings. I put a towel around her hands. I found the towel where some old flowers were. I tore it up into strips and tied the strips together. I laid her down on her back. There was an old tree there. She wasn't dead or nothing. She was coming to and I put my hand around her throat. I just put them on and took them back off. I got rocks and put on top of her. I covered the entire body with rocks, just rocks. I just covered her up with the rocks. I didn't know she was going to die. She didn't have nothing in her pockets. She had a little radio or something clamped to her. I throwed it away in the cemetery. I believe I can still remember. I took a watch off her arm. It was silver. It was no value. I had it in my hand and I took it to my grandfather's house and put it in the window. I walked up to the little gate, not to the one the cars go in and out of. I went on down on the Avenue. I was just standing around. It was kind of in the evening. It wasn't dark. I just stayed down that way. I didn't go back to Prichard, I just hung around, you know, on the Avenue. I ain't been to sleep ... yet. I stayed over at Robert's. That's when I got my gun. I believe it was Monday. I didn't tell Robert anything. It was Tuesday that Robert dropped me off on Spring Hill Avenue at Kennedy. I told him I was going to get a cheap room. I went to where I was at today. I didn'tI didn't take the truck from the cemetery because I can't drive no standard shift. I walked out of the cemetery. I don't know who might have took the truck. The boy that was staying behind me give me candy and stuff. I took the watch and radio after she fainted. I have read the foregoing statement and have had it read to me. I swear that it is true and correct to the best of my knowledge and belief. No threats, promises, offers of reward or other inducement have been made to me to get me to give the statement. I am fully aware of my rights to remain silent and to have an attorney present.'
"The statement completed 7:45 P.M., Saturday, 11/19/71 [sic]. Signed, Neil Singleton. Witness, Hubert Bell, Frank Woodard, and his girlfriend, Cathy Barnes."
Based upon appellant's statement, his grandfather's home was searched twice. During the second search conducted by Officer King, also of the Mobile Police Department, Sister Ann's silver Waltham watch was recovered. Sister Julie Hanser identified the watch at trial.
The appellant did not present any evidence during the guilt phase of his trial. His defense consisted of thorough cross-examination of prosecution witnesses, a motion to suppress his confession and the silver Waltham watch, a motion to exclude the State's evidence, and closing arguments identifying the weaknesses in the State's case.
Based on the evidence presented, the jury found the appellant "guilty of the capital felony as charged in the indictment."
During the subsequent sentencing phase hearing before the jury, the State introduced evidence of appellant's prior felony convictions, and the appellant presented his mother, Grace Bolden, who testified that the appellant was "slow" and that he had had mental "problems" which had required treatment at Searcy Hospital. The appellant also introduced into evidence documentation of his medical history and treatment at Searcy Hospital, which he contended was evidence of his extreme emotional disturbance.
The jury, after being adequately instructed to weigh the possible aggravating and mitigating circumstances, returned a punishment verdict, fixing appellant's punishment at death.
The trial court held a separate sentencing hearing, during which the only additional evidence presented was a pre-sentence investigation report for the appellant. The trial court made its findings of fact concerning *436 aggravating and mitigating circumstances and fixed appellant's punishment at death. The trial court's amended order setting forth its findings of fact, detailing the aggravating and mitigating circumstances it considered, and sentencing the appellant to "death by electrocution," is attached to this opinion as Appendix "A."

I
Appellant's constitutional challenge of the Alabama Supreme Court's actions in Beck v. State, 396 So.2d 645 (Ala.1980), of severing the "preclusion clause" and approving the remainder of Alabama's Death Penalty Statute, has been found meritless on numerous occasions and requires no further comment herein. See Coulter v. State, 438 So.2d 336 (Ala.Cr.App.1982), and cases cited therein.

II
Appellant contends that his confession, the written statement read into evidence by Sergeant Bell, was involuntary, and that the trial court, therefore, erred in denying his motion to suppress it. We disagree.
At trial, the appellant was given, out of the presence of the jury, a fair hearing on his motion to suppress his written statement. During this hearing, appellant's girlfriend, Cathy Barnes, testified that before the appellant admitted that he killed Sister Ann, the district attorney for Mobile County told her to sit in the appellant's lap, and told the appellant that he would drop all other charges against the appellant if the appellant would cooperate in the instant case. She also testified that the district attorney coaxed the appellant during his confession, and that the result was a statement, for the most part, in the words of the district attorney. The appellant contends that, based on this testimony by his girlfriend, the trial court should have granted his motion.
However, there was a substantial amount of evidence which contradicted Ms. Barnes's testimony. Officer Connick and Sergeant Bell testified that the appellant was advised of his Miranda rights twice before he made any statements, and that a printed "waiver of rights" form was given and read to him prior to any interrogation. The appellant stated that he understood his rights and then signed the waiver of rights form. Both officers further testified that the appellant was not threatened or offered rewards or leniency in exchange for his statement. Both were of the opinion that the appellant's statements (he also gave a preliminary statement which was not recorded) were voluntarily made. Sergeant Bell stated that the appellant was read the Miranda warnings a third time before his written statement was transcribed. This written statement was, subsequently, read to, and signed by, the appellant. Officer Connick stated that the district attorney did tell the appellant that if he did not wish to make a statement, he would be taken "back upstairs" to his cell, but that the district attorney did not induce or supplement appellant's written statement. He testified that the district attorney was not even in the interrogation room when either of appellant's statements was made.
The trial court, after hearing this evidence and viewing each witness on the stand, ruled "that the statements were voluntarily and freely made." This decision was within the sound discretion of the trial court and was supported by a preponderance of the evidence. Baldwin v. State, 372 So.2d 26 (Ala.Cr.App.1978), aff'd, 372 So.2d 32 (Ala.1979); Moore v. State, 415 So.2d 1210 (Ala.Cr.App.1982); Bryant v. State, 428 So.2d 641 (Ala.Cr.App.1982), and cases cited therein. The trial court's decision was not palpably contrary to the weight of the evidence and will, therefore, not be disturbed on this appeal. Baldwin v. State, supra; Bryant v. State, supra.

III
In instructing the jury with reference to the appellant's confession, the trial court stated:
"Do you know yesterday when you werethe jury was out of here for a *437 long period of time? It is incumbent upon the Court first to hear all of the testimony and first the Court must decide that it is a voluntary statement and that it is admissible into evidence. The Court first makes this determination, which I did, and I allowed the confession to be introduced. But, again, I am not the trier of the facts, you are. So, then the burden is upon the State to show you that it was a, quote, voluntary statement...."
The appellant contends that this instruction was erroneous because it implied to the jury that the trial court's "voluntariness" determination was based on information that the jury did not receive, and, thereby, induced the jury to rely upon the trial court's ruling that the confession was voluntary.
In reviewing this instruction in light of the trial court's entire oral charge, we have concluded that there was nothing in the trial court's statements that was prejudicial to the appellant. The quoted instruction did not imply that the jury should accept and believe appellant's confession based on the trial court's ruling that the statement was voluntary. To the contrary, the charge erroneously placed the additional burden upon the State of proving to the jury that the confession was voluntary.
Correctly stated, the duty of determining whether or not a confession was voluntary rests exclusively with the trial court. Matthews v. State, 55 Ala. 65 (1876); Cole v. State, 352 So.2d 17 (Ala.Cr. App.), cert. denied, 352 So.2d 20 (Ala.1977); Hobbs v. State, 401 So.2d 276 (Ala.Crim. App.1981). Once the trial court has ruled that a confession was voluntarily made and is, therefore, admissible, the jury must accept it as voluntary. Washington v. State, 53 Ala. 29 (1875); Matthews v. State, supra; Cole v. State, supra. The jury's duty is limited to the determination of the weight and credibility to be given to the confession. Washington v. State, supra; Matthews v. State, supra; Cole v. State, supra; Hobbs v. State, supra.
Although the trial court's wording of the supplemental instruction, quoted above, might have been misleading to the jury, we have concluded, in light of the trial court's entire charge to the jury, that any error was in appellant's favor and was, therefore, harmless. A.R.A.P. 45.

IV
During closing argument, the prosecutor held, in his hand, the old indictment from appellant's previous trial on the instant offense. The appellant, subsequently, pointed out to the trial court that on the back of that indictment was typed the former jury's verdict of guilty. He, therefore, moved for a mistrial, alleging that the jurors could read the back of the indictment. The trial judge denied appellant's motion because, from his view of the prosecutor and the jury during closing argument, he had concluded that, contrary to appellant's assertions, the jurors could not have read what was typed on the back of the indictment. Nevertheless, the appellant cites the trial court's denial of his motion for a mistrial as reversible error. We disagree.
The appellant has presented no evidence that the jurors did read the back of the indictment. For aught that appears, his arguments are based upon speculation and conjecture. The trial judge, who was in the best position to determine whether the appellant was prejudiced by the prosecutor's conduct, concluded that the jurors could not have read the back of the indictment. Under these circumstances, this factual determination by the trial judge will not be disturbed on this review. See Cameron v. State, 346 So.2d 508 (Ala.Cr.App.1977); Duncan v. City of Birmingham, 384 So.2d 1232 (Ala.Cr.App.1980); Minnifield v. State, 392 So.2d 1288 (Ala.Cr.App.1981).

V
The appellant contends that the trial court erred in finding, as an aggravating circumstance, that the instant offense was committed "while he was under sentence of *438 imprisonment, although he was serving the latter part of his sentence on parole at the time."[1] The appellant argues that he was not "under sentence of imprisonment" on November 12, 1977, when Sister Ann was killed, and that there was no evidence in the record to the contrary.
We have examined the record on appeal and have been unable to determine from the evidence included, therein, whether or not the appellant was, in fact, "under sentence of imprisonment, although he was serving the latter part of his sentence on parole at the time," when Sister Ann was killed. For this reason, although we affirm the conviction, we must remand this cause to the trial court for a new sentencing hearing before the trial court. If the evidence proves that the appellant was not "under sentence of imprisonment" at the time of the instant offense, then the trial court must reweigh the other aggravating circumstances[2] and the mitigating circumstances and decide upon the appropriate punishment. The evidence presented during the new sentencing hearing before the trial court and the trial court's corresponding order of "Findings of Fact," based on said evidence, should be forwarded to us for further review. The new hearing should be conducted pursuant to §§ 13-11-3 and -4, Code of Alabama 1975, as prescribed in Beck v. State, 396 So.2d 645 (Ala.1980), as modified on denial of rehearing, 1981, and the trial court's "Findings of Fact" should reflect that the hearing has been conducted pursuant to the Beck standards.
For the reasons stated above, appellant's conviction is affirmed, but this cause is remanded for further proceedings not inconsistent with this opinion.
AFFIRMED; REMANDED FOR PROPER SENTENCING.
All the Judges concur.

APPENDIX "A"

STATE OF ALABAMA

v.

CORNELIUS SINGLETON

CASE NO. CC-78-000117
On December 15, 1981 in open court, this Court issued its Order of findings in the above-mentioned case. After further deliberation and study and advising all of the attorneys of record, the Court amends its order of December 15, 1981 and submits this Order in its entirety in lieu thereof.
The Court, having conducted a hearing pursuant to Title 13A-5-47 of the Code of Alabama, to determine whether or not the Court will sentence Mr. Cornelius Singleton to death or to life imprisonment without parole, and the Court having considered the evidence presented at the trial and at said sentencing hearing; the Court makes the following findings of fact:
The Court first considers the aggravating circumstances as outlined and described in Title 13A-5-49.
(1) The Court finds that the capital offense was committed by Cornelius Singleton while he was under sentence of imprisonment, although he was serving the latter part of his sentence on parole at the time;
(2) The Court finds no evidence that Mr. Singleton was previously convicted of another capital offense;
(3) The Court finds that there is no evidence that the Defendant did knowingly create a great risk of death to many persons;
(4) The Court finds the capital offense was committed while the Defendant was engaged in the commission of a robbery;
(5) The Court finds the capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
(6) The Court finds that the capital offense was not committed for pecuniary gain;
*439 (7) The Court finds the capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;
(8) The Court finds the facts to be that Sister Ann Hogan while praying was approached by the Defendant at the Stone Street Cemetery on November 12, 1977, and asked her for help concerning problems with his girlfriend. After Sister Ann Hogan advised the Defendant she would pray for him, he attacked her, robbed her, tied her hands and feet, gagged her and buried her under rocks and debris, either dead or to die. The Court finds the foregoing facts were adduced from the trial and sentencing hearing, and based upon said findings of facts the Court finds this treatment of Sister Ann Hogan to be outrageously and extremely wicked, vile and shockingly evil. It is, therefore, the opinion of this Court that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses.
The Court finds beyond a reasonable doubt and to a moral certainty that the aggravating circumstances described in Title 13A-5-49 and set out hereinabove in subparagraphs (1), (4) and (8) particularly apply to the Defendant Cornelius Singleton in this case.
The Court now considers the mitigating circumstances as described and set out in Title 13A-5-51, Code of Alabama.
(1) The Court finds that Mr. Singleton has a significant history of prior criminal activity in that he has previously been convicted for burglary and arson;
(2) The Court finds that the capital offense itself was not committed while Mr. Singleton was under the influence of extreme mental or emotional disturbance;
(3) The Court finds that the victim was not a participant in Mr. Singleton's conduct, and did not consent to the act;
(4) The Court finds that Mr. Singleton was not an accomplice in the capital offense committed, but was, in fact, the principal who struck, tied the hands and feet, gagged and buried Sister Ann Hogan causing her death;
(5) The Court finds that Mr. Singleton did not act under extreme duress or under the substantial domination of another person;
(6) The Court finds that the capacity of Mr. Singleton to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired. However, the Court does find that Mr. Singleton's intellectual capacity was limited;
(7) The Court finds that Mr. Singleton was only twenty-one years of age at the time this capital offense was committed, but the Court finds his age is not a mitigating circumstance.
The Court having considered the aggravating circumstances and the mitigating circumstances and after weighing the aggravating and mitigating circumstances, the Court is convinced beyond a reasonable doubt and to a moral certainty and it is the judgment of the Court that the aggravating circumstances far outweigh the mitigating circumstances and that the death penalty as fixed by the jury should be and is hereby accepted.
It is therefore considered and adjudged by the Court that Cornelius Singleton is guilty of the Capital Offense charged in the indictment and specifically of intentionally killing Sister Ann Hogan during the course of a robbery of said Sister Ann Hogan, deceased.
It is therefore ORDERED, ADJUDGED AND DECREED that you, Cornelius Singleton, suffer death by electrocution at any time before the hour of sunrise on the 15th day of March, 1982, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
It is therefore further ORDERED, ADJUDGED AND DECREED by the Court that the Warden of William C. Holman Unit of the Prison System at Atmore, or in the *440 case of his death, disability or absence, his Deputy, or in the event of the death, disability or absence of both the Warden and his Deputy, then the person designated as Administrator by law for such purpose, at any time before the hour of sunrise shall on the 15th day of March, 1982, inside the walls of the William C. Holman Unit of the Prison System at Atmore, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of the said Cornelius Singleton, a current of electricity of sufficient intensity to cause his death, and the continual application of such current through the body of the said Cornelius Singleton until the said Cornelius Singleton be dead, and may Almighty God have mercy on Your Soul.
ORDERED this the 22nd day of December, 1981.
 /s/ Ferrill D. McRae
 Ferrill D. McRae, Circuit Judge
 Thirteenth Judicial Circuit
 State of Alabama

ON RETURN TO REMAND
SAM TAYLOR, Judge.
On remand to the circuit court a sentencing hearing was held in which the State conceded that the appellant, Cornelius Singleton, was not on parole in November of 1977, when the crime was committed. No new evidence was raised by the appellant at the hearing.
The hearing was conducted pursuant to the procedures prescribed in Beck v. State, 396 So.2d 645 (Ala.1980). The trial court reweighed the aggravating circumstances and the mitigating circumstances, and decided that the proper sentence was death.[1]
Beck v. State, supra, requires the appellate court to make the following determinations. Singleton was indicted and convicted of murder while in the process of committing a robbery in violation of Section 13-11-2(a)(2), Code of Alabama 1975 (repealed, July 1, 1981), which is punishable by death. Similar crimes are being punished by death: Colley v. State, 436 So.2d 11 (Ala.Cr.App.1983); Raines v. State, 429 So.2d 1104 (Ala.Cr.App.1982), aff'd, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). The sentence of death is appropriate in relation to Singleton, who murdered a nun who had gone to the cemetery to pray for the souls of deceased nuns.
This case is due to be affirmed.
OPINION EXTENDED;
AFFIRMED.
All the Judges concur.

APPENDIX

STATE OF ALABAMA

v.

CORNELIUS SINGLETON, Defendant

CASE NO. CC-78-117

SECOND AMENDED

SENTENCE ORDER
The original sentence order in this case which was issued on December 15, 1981, was amended by way of replacement with a new order on December 22, 1981. The Alabama Court of Criminal Appeals in a decision dated February 1, 1983, has ordered this Court to conduct a new sentence hearing to determine whether the defendant, Cornelius Singleton, was in fact under sentence of imprisonment at the time the capital offense involved in this case was committed. The Court of Criminal Appeals further directed this Court to enter findings of fact and to re-weigh the aggravating and mitigating circumstances, if necessary. The Alabama Supreme Court denied certiorari in the case on May 27, 1983, and the formal appellate court mandate issued May 30, 1983.
Pursuant to the directions of the Alabama Court of Criminal Appeals, a hearing *441 was conducted in this case on remand on September 21, 1983. Based on that hearing, and on the other sentence hearings previously conducted in this case, this new sentence order is issued in place of the previous one.

FACTS CONCERNING THE CRIME
On the afternoon of November 12, 1977, Sister Ann Hogan, a fifty-one year old nun, walked to the Catholic Cemetery on Stone Street in Mobile, Alabama. November is All Souls month, and Sister Ann went to the cemetery to pray for the dead. While there and while praying for the dead, Sister Ann was approached by the defendant, Cornelius Singleton. After talking with the defendant, Sister Ann told him she would pray for him. Sometime after Sister Ann told him that, the defendant robbed her and murdered her. He stole her watch from her and took it to his grandparents' house from which it was eventually recovered.
During the course of the crime, Sister Ann's panty hose was ripped, and her glasses, keys, and other personal items were scattered about the cemetery. Her neck, throat, head, and one of her legs were injured in the attack. After subduing the nun, who was only five foot four inches tall, the defendant tied her hands and legs together with her shoelaces and with strips torn from a towel. He also gagged her with a towel so that she could not scream for help. After dragging Sister Ann from the cemetery to a densely wooded area, the defendant buried her face down under a pile of rocks, bricks, a log or tree trunk, and other debris. She died from suffocation, which was caused or contributed to by the towel the defendant knotted around her neck and stuffed into her mouth.

AGGRAVATING CIRCUMSTANCES FINDINGS
The capital offense was not committed by the defendant while he was under sentence of imprisonment. While the Court originally found this aggravating circumstance to exist, the State has now conceded that the defendant's sentence from another conviction had expired prior to November 12, 1977, the date on which he robbed and murdered Sister Ann. Accordingly, the Code of Alabama 1975, § 13-11-6(1) aggravating circumstance does not exist and is not considered.
The defendant was not previously convicted of another capital offense or of a felony involving the use or threat of violence to a person. Accordingly, the § 13-11-6(2) aggravating circumstance does not exist and is not considered.
The defendant did not knowingly create a great risk of death to many persons. Accordingly, the § 13-11-6(3) aggravating circumstance does not exist and is not considered.
The capital offense was committed while the defendant was engaged in the commission of a robbery. Accordingly, the § 13-11-6(4) aggravating circumstance does exist.
The capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. Accordingly, the § 13-11-6(5) aggravating circumstance does not exist and is not considered.
The capital offense was not committed for pecuniary gain. Accordingly, the § 13-11-6(6) aggravating circumstance does not exist and is not considered.
The capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. Accordingly, the § 13-11-6(7) aggravating circumstance does not exist and is not considered.
The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. While all capital offenses are heinous, atrocious, or cruel to some extent, this one was especially so. It involved the unprovoked and brutal murder of a nun who was in a cemetery praying for the dead. The defendant robbed and murdered her after she had told him she would pray for him. Death was not instantaneous, but on the contrary Sister Ann *442 was terrorized and subjected to pain before she died. Furthermore, although this finding is not necessary to the conclusion, the evidence convinces the Court that Sister Ann was buried alive, being suffocated by the towel only after she was bound hand and foot and buried face down under debris. This capital offense stands out among the common run of capital offenses as one that is outrageously and extremely wicked, vile, and shockingly evil. Accordingly, the § 13-11-6(8) aggravating circumstance does exist.
In summary, the Court finds beyond a reasonable doubt and to a moral certainty that the § 13-11-6(4) and § 13-11-6(8) aggravating circumstances exist in this case.

MITIGATING CIRCUMSTANCES FINDINGS
The defendant has a significant history of prior criminal activity, having been previously convicted of arson and burglary. Accordingly, the § 13-11-7(1) mitigating circumstance does not exist.
The capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance. Accordingly the § 13-11-7(2) mitigating circumstance does not exist.
The victim, Sister Ann, was not a participant in the defendant's conduct and did not consent to it. Accordingly, the § 13-11-7(3) mitigating circumstance does not exist.
The defendant was not an accomplice in the capital offense whose participation was relatively minor, but was in fact the sole participant. It was he who struck Sister Ann, robbed her, bound and gagged her, dragged her to a wooded area and buried her alive, thereby causing her death. Accordingly, the § 13-11-7(4) mitigating circumstance does not exist.
The defendant did not act under extreme duress or under the substantial domination of another person. Accordingly, the § 13-11-7(5) mitigating circumstance does not exist.
The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired. Accordingly, the § 13-11-7(6) mitigating circumstance does not exist. However, this Court does find that the defendant's intellectual capacity was limited, and the Court does consider that as a non-statutory mitigating circumstance.
The defendant was twenty-one years of age at the time of the capital offense. In view of all the facts and circumstances, the Court does not find his age to be a mitigating circumstance. Accordingly, the § 13-11-7(7) mitigating circumstance does not exist.
In addition to considering the § 13-11-7 mitigating circumstance possibilities, the Court has also searched all the evidence and the pre-sentence report for non-statutory mitigating circumstances. In addition to the defendant's low intellectual ability, the Court finds and considers as a non-statutory mitigating circumstance the fact that the defendant has a poor socio-economic background and had an unstable early family situation.

THE SENTENCE
After considering the aggravating and mitigating circumstances and weighing them against each other, the Court is convinced beyond a reasonable doubt and to a moral certainty and it is the judgment of the Court that the aggravating circumstances far outweigh the mitigating circumstances, and the defendant should be sentenced to death.
It is therefore considered and adjudged by the Court that Cornelius Singleton is guilty of the capital offense charged in the indictment and specifically of intentionally killing Sister Ann Hogan during the course of robbing her.
It is therefore ordered, adjudged and decreed that, you, Cornelius Singleton, suffer death by electrocution at any time before the hour of sunrise on the 5th day of January, 1984, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in a room arranged *443 for the purpose of electrocuting convicts sentenced to death by electrocution.
It is therefore further ordered, adjudged and decreed by the Court that the Warden of the William C. Holman Unit of the Prison System at Atmore, or in the case of his death, disability or absence, his Deputy, or in the event of the death, disability or absence of both the Warden and his Deputy, the person appointed by the Commissioner of Corrections at any time before the hour of sunrise shall on the 5th day of January, 1984, inside the walls of the William C. Holman Unit of the Prison System at Atmore in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, shall cause to pass through the body of the said Cornelius Singleton a current of electricity of sufficient intensity to cause his death, and a continual application of such current through the body of the said Cornelius Singleton until the said Cornelius Singleton be dead, and may Almighty God have mercy on Your Soul.
DONE this 21st day of September, 1983.
 /s/ Ferrill D. McRae
 Ferrill D. McRae, Judge
 Thirteenth Judicial Circuit.
NOTES
[1] See Appendix "A."
[2] See Appendix "A."
[1] See the trial court's "Second Amended Sentence Order," included as an appendix to this opinion.